BROWN WHITE & NEWHOUSE LLP
THOMAS M. BROWN (Bar No. 117449)
tbrown@brownwhitelaw.com
KENNETH P. WHITE (Bar No. 173993)
kwhite@brownwhitelaw.com
CALEB E. MASON (Bar No. 246653)
cmason@brownwhitelaw.com
333 South Hope Street, 40th Floor
Los Angeles, California 90071-1406
Telephone: 213. 613.0500
Facsimile:  213.613.0550

Attorneys for Plaintiffs
DOWNEY FIREMEN'S ASSOCIATION,
LOCAL 3473, ET AL.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOWNEY FIREMEN'S ASSOCIATION, LOCAL 3473, a non-profit organization, STEVEN DAVIS, an individual, DANIEL RASMUSSEN, an individual, THOMAS DANIERI, an individual, JAY IBEY, an individual, SCOTT DEVEREUX, an individual, DAN HURLOCK, an individual, TED MATSUMOTO, an individual, FRANK CULHNO, an individual, RYAN SCHLEIGER, an individual, KEVIN KIM, an individual, IVAN ORLOFF, an individual, DAVID BLADES, an individual, JEFF SIMMONS, an individual, and JOSE GARCIA, an individual, Plaintiffs, v. CITY OF DOWNEY, a municipal corporation, LONNIE CROOM, an individual, and DOES 1 through 10, inclusive, Defendants. | Case No.: 14-cv-01213-CJC-RNB **PLAINTIFFS' BRIEFING BY ORDER OF THE COURT REGARDING JOINDER OF THE INDIVIDUAL AND ORGANIZATIONAL PARTIES** Judge: Honorable Cormac J. Carney Date:  March 2, 2015 Time:  1:30 p.m. Complaint filed: July 31, 2014 Trial Date: None set |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................... 1

II. FACTUAL BACKGROUND ................................................................... 2

III. PROCEDURAL HISTORY ...................................................................... 5

IV. ARGUMENT ............................................................................................ 6

    A. Legal Standard ............................................................................... 6

    B. Plaintiffs' Claims Meet the Standard for Joinder ......................... 6

        1. All Plaintiffs Assert A Joint Claim for Relief ................... 7

        2. All Plaintiffs' Claims Arise from the Same Series of Transactions and Occurrences .......................................... 7

        3. There are Common Questions of Fact and Law ............. 11

    C. Trying the Claims Separately Would Waste Judicial Resources ........... 12

    D. Defendants Are Not Prejudiced by Joint Proceedings ............................. 13

V. CONCLUSION ...................................................................................... 15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Butcher v. City of McAlester*,
  956 F.2d 973 (10th Cir. 1992) ................................................................................ 10

*Comer v. Schriro*,
  463 F.3d 934 (9th Cir. 2006) .................................................................................. 15

*League to Save Lake Tahoe v. Tahoe Regional Planning Agency*,
  558 F.2d 914 (9th Cir. 1977) ..................................................................... 6, 11, 13

*Mendocino Environmental Center v. Mendocino County*,
  192 F.3d 1283 (9th Cir. 1999) ................................................................................ 14

*Mosley v. General Motors Corp.*,
  497 F.2d 1330 (8th Cir. 1974) .......................................................................... 11, 12

*Russo v. Bache Halsey Stuart Shields, Inc.*, 554 F.Supp. 613 (D. Ill. 1982) ................ 11

*United Mine Workers v. Gibbs*, 383 U.S. 715 (1966) ...................................................... 6

*Visendi v. Bank of America*,
  733 F.3d 863 (2013) ......................................................................................... 6, 13

**Statutes**

42 U.S.C. § 1983 ............................................................................................................. 7

**Rules**

Fed. R. Civ. Proc. 20(a)(1) ........................................................................................ 6, 7
Fed. R. Civ. Proc. 20(a)(1)(B) ....................................................................................... 11
Fed. R. Civ. Proc. 21 ....................................................................................................... 6
Local Rule 83-1.3.1 (a)-(b) ............................................................................................ 13

**Other Authorities**

JOHN BUDD, LABOR RELATIONS: STRIKING A BALANCE 172
(4th Ed.) (2012) ............................................................................................................ 10

Kate Bronfenbrenner & Dorian Warren,
*The Empirical Case for Streamlining the NLRB Certification Process*,
Institute for Social and Economic Research and Policy (2011) ..................................... 10

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

This case arises from a years-long effort by the City of Downey ("Downey" or "the City") to destroy and punish its firefighters' union for exercising its First Amendment rights to free speech, in clear violation of section 1983. The dispute between the union and the City began in 2012 when the City announced plans to reduce its fire protection services and cut the pay and medical benefits of its firefighters. The firefighters' union, Plaintiff Downey Firefighters' Association ("DFA"), publicly spoke out against these unwise and dangerous proposals, and supported efforts to find viable alternatives, including having the County of Los Angeles Fire Department take over fire services in the City. Fourth Amended Complaint ("4AC")[1] ¶¶ 23, 31.

But in a backroom deal with Downey's then-mayor Mario Guerra, Defendant Fire Chief Lonnie Croom ("Croom") deliberately misrepresented to the City Council a proposed fire services restructuring plan, thereby torpedoing it. In exchange and as a reward, Guerra gave Croom a 5.5% pay increase, while reducing the pay of the rank and file firefighters by 5.5%. Croom undermined his firefighters for his own personal benefit. This betrayal led to a *unanimous* no-confidence vote by all 49 of the City's firefighters ("Vote"). *Id*. ¶¶ 34-35.

In retaliation for the Plaintiffs' exercise of their constitutional right of free speech and association, Croom and other Downey officials publicly and privately vowed to destroy the union, and began systematically to harass, intimidate, and punish the union and its members. Defendants' avowed goal is to "bleed [the union] dry" for its Vote of No Confidence ("Vote"). *Id*. ¶ 74.

---

[1] The Court's January 22, 2015 order states that Plaintiffs must "file their amended complaint consistent with this Minute Order." Doc. 38 at 5. In compliance with the Court's order, Plaintiffs filed their Fourth Amended Complaint ("4AC") on February 5, 2015. The 4AC is identical to the 3AC, except that Plaintiffs deleted all references to claims by the DFA on behalf of its members.

1

A union is a group of employees. A union is of, by, and for the employees who comprise it. To bust a union, you attack its individual members. To retaliate against a union, you retaliate against its members. That is precisely what Defendants undertook here. Defendants retaliated against the union and its individual firefighter members, as part of a planned and cohesive policy strategy that the Downey city government concocted, endorsed, and implemented.

This Court upheld the DFA's claims against Defendants' motions to dismiss, and Defendants concede that the individual firefighters' claims are properly pleaded and should proceed to the discovery phase. The only issue remaining is the one the Court posed *sua sponte*: should the claims of the individual firefighters be tried together with the claims of their union? The answer is yes.

## II.

## FACTUAL BACKGROUND

In the spring of 2012, Downey officials told the DFA that it was going to slash the Fire Department budget by 10% and that Downey's firefighters must accept a 5.5% salary reduction and reductions in their medical benefits. 4AC ¶¶ 23-33. In early 2013, Downey's then-Mayor and Council member Mario Guerra informed senior Downey officials that the firefighters would not receive their expected annual pay raise. *Id*. Several elected officials and the City Manager, angry at Guerra and seeking to retaliate against him, approached the DFA and asked the DFA to publicize Guerra's alleged improper use of City funds. *Id*. ¶¶ 25-30. The DFA declined to do so. *Id*. ¶ 30.

In late 2012 and early 2013, the City commissioned a study to determine the feasibility of consolidating Downey fire services with the Los Angeles County Fire Department ("Feasibility Study"). *Id*. ¶ 31. The Feasibility Study concluded that consolidation offered $2 million and $5 million per year in savings, faster response times, and a significant increase in manpower and equipment. *Id*.; *see* Exh. A to Defendant's Request for Judicial Notice, Doc. 31-1, at 1. The DFA and its members believed that the Feasibility Study demonstrated potential for maintaining a high level

of quality fire protection services in Downey, and requested that the City proceed to the next phase of study, a detailed Comprehensive Study. *Id.* ¶ 31. The DFA offered to pay the City's cost of $30,000 for the Comprehensive Study. *Id.*

But then-Mayor Guerra openly expressed dissatisfaction with the consolidation plan and set out to ensure that the Comprehensive Study was never undertaken. *Id.* ¶ 32. He offered Fire Chief Croom a deal: if Croom would publicly "tank" the consolidation plan, Guerra would ensure that Croom received a 5.5% pay raise. *Id.* On May 14, 2013, Croom upheld his end of the backroom deal: he appeared in front of the City Council and misrepresented the findings of the Feasibility Study, distorting its conclusions. *Id.* ¶ 33.

Relying on Fire Chief's Croom's misrepresentations, the City Council voted not to proceed with the Comprehensive Study, and to terminate consolidation negotiations with the County. *Id.* After the vote, Guerra upheld his end of the pact as well: in July 2013, he gave Croom (along with other senior managers) a 5.5% pay increase. *Id.* ¶ 34.

Croom's actions stunned the DFA. On May 19, 2013, all 49 members of the DFA signed a Vote of No Confidence in Croom ("Vote"). *Id.* ¶ 35. The Vote stated in pertinent part that Croom "knowingly and deliberately distorted and misrepresented the facts and figures contained in the Feasibility Study in his administrator report to the Downey City Council . . . ." *Id.* When Croom learned of the Vote, he called the Vote "a game changer," said that the DFA had "crossed the line," shouted profanities, and declared, "This means war!" *Id.* ¶ 36. City Council members reacted similarly. Council members stonewalled and prevented DFA's efforts to explain the reasons for Vote, berated DFA members publicly, shouted profanities at DFA leadership, and publicly called DFA members a "disgrace." *Id.* ¶ 37. For the next year and a half, the City and Croom pursued a campaign of retaliatory adverse employment actions aimed at punishing the DFA and its firefighter members and squashing their First Amendment expressions and activities. *Id.* ¶¶ 39-78. Defendants' retaliatory and vindictive actions include:

- refusing to promote qualified and experienced DFA members to a vacant Battalion Chief position (*id.* ¶¶ 41-48);
- prematurely and improperly terminating a Battalion Chief eligibility list (*id.* ¶ 44);
- pursuing frivolous and vindictive discipline investigations against DFA leadership and its members (*id.*¶¶ 49-55);
- refusing to hire a DFA member's son who passed all tests, held all necessary certifications, and ranked among the top of all candidates (*id.* ¶ 56);
- depriving DFA members of at least 210 shifts of overtime pay (*id.* ¶¶ 45-46);
- refusing to reinstate DFA members to paramedic positions despite the City's urgent need for paramedic firefighters (*id.* ¶¶ 57-58);
- threatening to sound emergency dispatch alarms throughout fire stations at early morning hours (*id.* ¶ 59(c));
- eliminating Fire Prevention Bureau positions, resulting in reduced overtime opportunities for DFA members (*id.* ¶ 59 (e));
- canceling badge pinning ceremonies (*id.* ¶ 59(g));
- refusing to promote DFA members to vacant positions (*id.* ¶ 59(k)); and
- refusing to process DFA's and its members' grievances in good faith (*id.* at ¶ 59(l)).

Defendants' retaliatory harassment, investigations, and disciplinary actions against DFA members caused the DFA to divert significant financial resources to the defense of its members against frivolous claims of wrongdoing. 4AC ¶¶ 49-57. Defendants actions also threatened the very existence of the DFA's membership, as Defendants' avowed and express goal was to "bleed [the DFA] dry" and force it to "spend all of its money" on discipline cases and grievances. *Id.* ¶ 74.

On December 23, 2013, the DFA, on behalf of itself and its 49 members who signed the Vote, filed a Tort Claim pursuant to California Government Code section 910, et seq. with the City ("Tort Claim"). *Id.* ¶ 60. The Tort Claim detailed the

constant and ongoing retaliation that the DFA and its members had experienced because of the Vote. *Id.* ¶ 60. Although not a prerequisite for filing a Section 1983 claim, the DFA filed the Tort Claim in an effort to encourage the City to put an end to the retaliation. *Id.*

Rather than resolve the issues regarding the adverse employment actions, the City doubled down on its retaliatory and illegal conduct: it publicly ratified and endorsed the retaliation and encouraged the unlawful behavior. *Id.* ¶¶ 61-64. Accordingly, the DFA and 14 of its members were compelled to file the instant lawsuit to seek redress for the damages the Defendants caused. After learning of the filing of this lawsuit, then-Mayor and Mario Guerra yet again publicly excoriated Plaintiffs, calling them "shameful," and further ratified Defendants' unlawful conduct. *Id.* ¶¶ 74-78.

## III.
## PROCEDURAL HISTORY

Plaintiffs filed the Original Complaint on July 31, 2014. Plaintiffs amended the complaint three times on September 2 and 29, 2014, and November 26, 2014. Plaintiffs filed the Third Amended Complaint ("3AC") following this Court's order of November 13, 2014, addressing Defendants' prior Motion to Dismiss. Order, Doc. 21.

Following the filing of the 3AC, Defendants filed a Motion to Dismiss. Defendants' motion challenged only the claims the DFA brought on its own behalf and on behalf of its members. Defendants did not challenge the claims brought by 14 individual firefighter plaintiffs. Defendants conceded that the claims brought by the 14 individual firefighter plaintiffs are properly pleaded.

On January 22, 2015, the Court denied Defendants' motion as to the claims the DFA brought on its own behalf and granted the motion as to the claims the DFA brought on behalf of its firefighter members. In its ruling, the Court *sua sponte* raised the issue of the joinder of the individual firefighters' claims with the DFA's claims, and ordered Plaintiffs to file briefing "to show cause why the fourteen Individual Plaintiffs should not be dismissed from this matter." Doc. 38 at 5. The Court also ordered that

"Plaintiffs shall file their amended complaint consistent with this Minute Order." Doc. 38 at 5. Plaintiffs have complied and filed a Fourth Amended Complaint that deletes references to any claim for relief the DFA brings on behalf of its members.

## IV.
## ARGUMENT

### A. Legal Standard

Rule 20(a)(1) of the Federal Rules of Civil Procedure governs the permissive joinder of plaintiffs and provides in pertinent part:

> Persons may join in one action as plaintiffs if:
>
> (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
> (B) any question of law or fact common to all plaintiffs will arise in the action.

Fed. R. Civ. Proc. 20(a) (1).

The rules governing joinder are to be liberally construed in favor of joinder. In *United Mine Workers v. Gibbs*, the Supreme Court explained that "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties, and remedies is strongly encouraged." *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966). The Ninth Circuit holds that Rule 20 "is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits." *League to Save Lake Tahoe v. Tahoe Regional Planning Agency*, 558 F.2d 914, 917 (9th Cir. 1977).

Under the Rules, "[m]isjoinder of parties is not a ground for dismissing an action." Fed. R. Civ. Proc. 21. The court may sever the claims of one or more parties, as long as the dismissal is without prejudice to re-filing, and the party is not prejudiced. *Visendi v. Bank of America*, 733 F.3d 863, 861 (2013).

### B. Plaintiffs' Claims Meet the Standard for Joinder

Plaintiffs' individual claims meet the standard for joinder for three principal reasons. First, the DFA and the individual firefighters <u>jointly assert a claim to relief</u> for

retaliation in violation of their First Amendment rights.  Second, the DFA and the individual firefighter Plaintiffs rely on the <u>same series of acts and omissions</u> as constituting the improper retaliation.  Finally, there are overlapping, indeed, identical, issues of fact and law.  This is a paradigmatic case of proper joinder.  The claims for relief, the issues, of law, and the factual proof all stand in a strong logical relationship to one another.

### 1. All Plaintiffs Assert A Joint Claim for Relief

The 4AC contains only a single common claim for relief:  retaliation based on the exercise of First Amendment rights in violation of 42 U.S.C. § 1983.  4AC ¶¶ 79-86.  That claim for relief is common to all plaintiffs, and as to all plaintiffs, it is based on the same series of retaliatory acts by Defendants.

The gravamen of this lawsuit is that the DFA members who signed the Vote of No Confidence on May 19, 2013 suffered significant and pervasive retaliation at the City's hands because of their exercise of their First Amendment rights, in violation of section 1983.  *Id.* ¶¶ 35-78.  The protected act that triggered the retaliation was the same event:  the signing the Vote of No Confidence.  *Id.* ¶ 36 ("This means war!").  This Vote was undertaken and presented to the City jointly by the individual firefighters and the DFA.  Every retaliatory act set forth in the complaint is alleged to be retaliation for that act of political speech, as Defendants set out systematically to destroy the DFA and harass its members in clear violation of section 1983.  In short, there is a single claim for relief here, jointly asserted by all plaintiffs.  This is a paradigmatic case for joinder.

### 2. All Plaintiffs' Claims Arise from the Same Series of Transactions and Occurrences

The single claim for relief in this case arises from a common series of transactions and occurrences, as Rule 20(a)(1) requires.  Defendants retaliated against the DFA and its members by engaging in a concerted series of retaliatory actions directed against them, collectively *and* individually.  These acts were part of an organized campaign that was, in the words of Defendant Croom, intended to "bleed the

union dry" by forcing it to spend all its time and resources on grievances. 4AC ¶¶ 75-75.

The triggering incident was the same for the individual firefighters *and* the DFA: the No-Confidence Vote. Defendants' motive was the same: retaliation. And Defendants' intent was the same: destroy the union by harassing and punishing its members for the Vote. Every retaliatory act aimed at busting the union was an act that targeted and harmed one or more individual firefighters. The transactions and occurrences that support the common claim to relief as to each plaintiff are largely either the same transactions and occurrences as to each plaintiff. And Defendants' actions that were targeted at a single plaintiff, e.g., refusing to hire a plaintiff's son, *id.* ¶ 58, or refusing to shake plaintiffs' hands, *id.* ¶ 62(a), are part of the same integrated series of transactions and occurrences under Rule 20 because they were part of a single concerted anti-union campaign.

Many of Defendants' retaliatory actions are set forth in detail in paragraphs 35 to 82. Those paragraphs tell a single story: the story of city officials who threatened and took revenge when the City's firefighters exercised their First Amendment rights and spoke up against a plan to cut public safety funding. The story is straightforward.

In the spring of 2013, Downey was in the process of reducing fire safety services. The firefighters believed that consolidation with the Los Angeles County Fire Department was the key to maintaining the safety of the City, and full staffing of their fire trucks, and so they requested further study of the consolidation proposal. *Id.* ¶ 31. In May 2013, then-Fire Chief Lonnie Croom suddenly and unexpectedly scuttled the consolidation studies. *Id.* ¶ 33. He did so after misrepresenting the results of a preliminary cost study to the City Council and persuading the City Council not to pursue consolidation. *Id.* The firefighters thereafter discovered that Croom had acted at the behest of then-Mayor Mario Guerra, who had promised Croom in a backroom deal a personal pay raise of 5.5% in exchange for his cooperation at the same time the City cut the rank and file firefighters pay by 5.5%. *Id.* ¶¶ 24, 34.

After the firefighters discovered that their Fire Chief had traded away their safety and that of the City for his own pay raise, they met to vote on whether to publicly express their disapproval and dissatisfaction with his nefarious and selfish conduct. On May 19, 2013, the firefighters — all 49 of them — voted unanimously in favor of a resolution of no confidence in Croom. *Id.* ¶ 35. The Vote stated in pertinent part that Croom "knowingly and deliberately distorted and misrepresented the facts and figures contained in the Feasibility Study in his administrator report to the Downey City Council . . . ." *Id.* Capt. Steve Davis, the union president, delivered the resolution to the City Council on June 5, 2013. Croom's response: "This means war!" *Id.* ¶ 36.

Croom, the City, and other City officials engaged in a months-long campaign to systematically "bleed the [union] dry" by, inter alia, harassing its members with frivolous disciplinary measures, forcing the union to exhaust its resources on grievances, *id.* ¶¶ 50-57, 74; refusing to promote or hire any DFA members or their relatives, *id.* ¶¶ 42-46, 58; and imposing various adverse employment conditions on DFA members, such as denial of overtime shifts.

The Defendants' actions were directed at all individual Plaintiffs and other firefighters, precisely because they were DFA members, in order to retaliate against the DFA and its membership for the Vote. For example, Plaintiffs Danieri, Devereux, Hurlock, and Ibey had successfully completed the department's rigorous testing program for a vacant Battalion Chief position. *Id.* ¶ 42. Croom refused to promote any of them because they were DFA members and had signed the Vote. *Id.* ¶ 48. He retaliated further and prematurely terminated their eligibility for the promotion. *Id.* ¶ 44.

Croom's refusal to promote DFA members also damaged Plaintiffs Orloff and Blades. These firefighters were eligible for promotion to positions that would have been vacated had Croom promoted Danieri, Devereux, Hurlock, or Ibey. *Id.* ¶ 46. Croom's refusal to fill vacant positions also deprived each individual plaintiff of overtime shifts that otherwise would have been available. *Id.* ¶¶ 45-46.

Defendants also refused to hire relatives of DFA members. Plaintiff Matsumoto's son was among the top five candidates on the department's tests, and was also a licensed paramedic, a position the department needed to fill. *Id.* ¶ 58. But Defendants refused to hire him because he was Matsumoto's son, and Matsumoto was a DFA member and had signed the Vote. *Id.*

Plaintiffs Garcia and Simmons were licensed paramedics as well as firefighters, and were also candidates for the vacant paramedic positions. *Id.* ¶ 59. Prior to the Vote, Croom had offered paramedic positions to them. *Id.* But after the Vote, Croom refused to reinstate Garcia and Simmons as paramedics, hiring outside candidates instead. *Id.* ¶¶ 59-60.

Defendants also targeted DFA members for frivolous disciplinary investigations. Plaintiffs Davis, Culhno, Rasmussen, Schleiger, and Kim were all the targets of frivolous, pretextual, and harassing disciplinary investigations. *Id.* ¶¶ 51-55.

This case is, in short, a tightly focused narrative about the City's illegal response to protected political speech by its firefighters. It presents a strongly interconnected series of transactions and occurrences that fit a textbook pattern of systematic "union-busting" tactics. *See*, *e.g*., JOHN BUDD, LABOR RELATIONS: STRIKING A BALANCE 172 (4th Ed.) (2012) ("Union suppression tactics include harassment, demotion, or firing of union supporters."); Kate Bronfenbrenner & Dorian Warren, *The Empirical Case for Streamlining the NLRB Certification Process*, Institute for Social and Economic Research and Policy (2011).[2]

Plaintiffs specifically allege that Defendants' actions were part of a concerted effort to destroy the union in violation of section 1983. In *Butcher v. City of McAlester*, 956 F.2d 973, 979 (10th Cir. 1992), the Tenth Circuit affirmed a jury verdict for a firefighters' union and several of its individual members in a section 1983 retaliation

---

[2] Available at http://iserp.columbia.edu/sites/default/files/working_papers/working_paper_cover_2011-01-final.pdf), at 3 (listing activities such as coercive statements, threats, discipline, harassment, retaliation, interrogation, surveillance, and alteration of working conditions).

case similar to the instant case. In *Butcher*, the claims of the individual firefighters and those of the union itself were tried jointly. *Id*. at 975-76. The facts in *Butcher* presented a virtually identical narrative of retaliatory harassment, frivolous disciplinary actions intended to distract the union and deplete its funds, manipulation of overtime schedules, described it as "a union-busting effort." *Id*. The jury found in favor of firefighters and their union in lawsuit alleging First Amendment retaliation based on plaintiffs' exercise of their speech and organization rights.

Litigating and trying the claims together makes legal and practical sense. Courts have routinely held that similarly connected, and also *less* connected, series of transactions meet the liberal Rule 20 standard for joinder. *See*, *e.g.*, *League to Save Lake Tahoe v. Tahoe Regional Planning Agency*, 558 F.2d 914, 917 (9th Cir. 1977) (multiple land developers were properly joined in action challenging environmental regulation, because although the projects were distinct, all could be halted if the regulation was held to be invalid); *Mosley v. General Motors Corp*., 497 F.2d 1330, 1333-34 (8th Cir. 1974) (district court abused its discretion in ordering severance of multiple plaintiffs in retaliation and discrimination case, because the defendant employer and the alleged motive were the same in each case , although the specific alleged retaliatory acts varied from plaintiff to plaintiff); *Russo v. Bache Halsey Stuart Shields, Inc*., 554 F.Supp. 613, 617 (D. Ill. 1982) (multiple plaintiffs with claims against the same company were properly joined because each had interacted with the same account executive).

### 3. There are Common Questions of Fact and Law

The individual firefighters and DFA claims also present common questions of fact and law under Rule (a)(1)(B). Both the individual firefighter and DFA Plaintiffs allege that the triggering incident was the May 19, 2014 Vote of No Confidence. It is therefore a common question of fact whether Defendants' actions were taken in response to the Vote. Similarly, it is a common question of law whether the Vote constitutes protected conduct for purposes of a section 1983 retaliation claim.

All individual firefighter plaintiffs also claim that Defendants targeted them for harassment because of their association with the DFA.  It is therefore a common question of fact whether Defendants in fact had that intent and so targeted them.  Similarly, it is a common question of law whether membership in or association with the DFA constitutes protected conduct for purposes of a section 1983 retaliation claim.

The Eighth Circuit has held that severance in such circumstances is an abuse of discretion.  In *Mosley v. General Motors Corp*., 497 F.2d 1330 (8th Cir. 1974), ten individual plaintiffs each alleged that he had been subjected to retaliation and discrimination by General Motors Corporation.  The Eighth Circuit held that the district court had abused its discretion in ordering severance of the plaintiffs' claims.  The court explained that though the specific actions directed at each individual plaintiff may have differed, "[t]he discriminatory character of the defendants' conduct is thus basic to each plaintiff's recovery."  497 F.2d at 1330.  Accordingly, "[t]he fact that each plaintiff may have suffered different effects from the alleged discrimination is immaterial for the purposes of determining the common question of law or fact."  *Id*.

Just so here: the discriminatory and retaliatory character of Defendants' conduct is basic to each plaintiff's recovery.

## C. Trying the Claims Separately Would Waste Judicial Resources

As the foregoing analyses demonstrate, this is precisely the kind of case that the rules and case law contemplate as a joint action.  The claims, facts, and legal questions overlap; indeed, they are largely coextensive.

Severance would benefit neither party, and would frustrate the aims of judicial economy and consistency of judgments that support Rule 20.  This Court has now upheld the DFA's claim against Defendants' pleading challenges, and Defendants have stipulated that the individual firefighters' claims are properly pleaded.  Reply in Support of Motion to Dismiss, Doc. 37, 3:7-10.  The question whether all of the 15 plaintiffs in this action have properly stated claims for relief is now resolved: they have. Severance would therefore create up to 15 separate actions (depending on whether any would be

deemed properly joined),[3] each of which would have to proceed through discovery to trial on largely coextensive facts.

Such duplicative proceedings would needlessly tax the resources of the Court and the parties. The courts construe the joinder rules broadly precisely to avoid such unnecessary duplication. *See*, *e.g.*, *League to Save Lake Tahoe v. Tahoe Regional Planning Agency*, 558 F.2d 914, 917 (9th Cir. 1977) ("[T]he primary purpose [of Rule 20] is to promote trial convenience and to prevent multiple lawsuits.").

However, in the event that the Court rules that the claims should not be tried jointly, Rule 21 provides that "[m]isjoinder of parties is not a ground for dismissing an action." Rather, if the standard for joinder is not met, though it is here, the court may sever a party or parties from an action, so long as no parties' substantial rights will be prejudiced thereby. *Visendi v. Bank of America*, 733 F.3d 863, 861 (9th Cir. 2013).

### D.     Defendants Are Not Prejudiced by Joint Proceedings

Defendants will not be prejudiced by proceeding jointly on all claims. The individual plaintiffs have been part of the case since the filing of the original complaint, but at no time have Defendants raised any issues regarding joinder. Defendants have filed motions to dismiss the DFA's claims, and to strike portions of the Second and Third Amended Complaints, but Defendants have never moved to sever the individual firefighters' claims. Indeed, they have expressly conceded that the individual claims are well-pled.

Defendants' Motion to Dismiss sought dismissal only of claims brought by the DFA, *see* Motion to Dismiss, Doc. 29 at 2:14, and in their Reply brief, Defendants *expressly conceded* that the individual claims were well-pleaded:

//

---

[3] Under Local Rule 83-1.3, the individual plaintiffs would each be required to file a Notice of Related Cases, and under that Rule, all the cases would be consolidated because they "arise from the same or a closely related transaction, happening, or event" and they "call for the determination of the same or substantially related or similar questions of law and fact." Local Rule 83-1.3.1 (a)-(b).

> Plaintiffs are correct in asserting that the Defendant has not challenged the sufficiency of the claims of the individually named Plaintiffs for purposes of a Motion to Dismiss per FRCP 12(b)(6). …[T]he individual Plaintiffs have met the pleading standards to overcome a Motion to Dismiss….

Reply in Support of Motion to Dismiss, Doc. 37, 3:7-10.

Defendants' decision not to request severance is correct and logical because Defendants themselves would be significantly burdened by the need to simultaneously litigate multiple lawsuits based on the same alleged series of occurrences. As set forth above, for example, each individual plaintiff has the right to discover, and prove at trial, facts regarding the full range of alleged retaliatory conduct. It is not in Defendants' interest to respond to 15 separate sets of discovery requests, and try 15 different cases, all involving the same set of relevant facts. It is in the Court's and all parties' interest to resolve this dispute fully and finally.

Nor could Defendants now claim that any prejudice might ensue from continuing with joint proceedings because all the evidence is cross-admissible in all Plaintiffs' claims. The evidence Plaintiffs will present in a joint trial will be the same as the evidence that would be presented in two, three, or 15 trials, because the full range of Defendants' alleged conduct is admissible motive and intent evidence under Rule 404(b) of the Federal Rules of Evidence. It is also evidence of the City's ratification of the retaliatory actions of Croom and others. And each Plaintiff needs to prove both motive and intent and official ratification. The conduct set forth in Paragraphs 62-82, for example, is admissible on these two bases as to all the individual firefighters and the DFA.

All Plaintiffs must prove retaliatory intent and may do so through circumstantial evidence. *See Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1300-01 (9th Cir. 1999) ("Intent to inhibit speech, which is an element of the [retaliation] claim, can be demonstrated either through direct or circumstantial evidence."). Accordingly, all the individual firefighters and the DFA are required and

entitled to put on evidence that the goal of Defendants' actions was to destroy the DFA. *See*, *e.g.*, 4AC ¶¶ 74-75.

All Plaintiffs are entitled to prove, for example, that Defendant Croom stated that he intended to fill all positions "from the outside," rather than promoting any DFA member, *id*. ¶ 62(j); that Defendants improperly refused to hire a DFA member's son (who was at the top of his testing group), *id*. ¶¶ 39, 58; that Defendants improperly refused to promote DFA members, *id*. ¶¶ 43-48, 62(j-k); that Defendants improperly refused to hire qualified DFA firefighters as paramedics, *id*. ¶¶ 59-61; that Defendants attempted to discipline, suspend, and/or terminate the DFA's officers, including its President, *id*. ¶ 51, its Vice-President, *id*. ¶ 53, and its Secretary, *id*. ¶ 54; that Defendants interrogated DFA members about the alleged actions of other members, *id*. ¶ 56; and that Defendants used private investigators to conduct surveillance on DFA members, *id*. ¶ 57. All of the above allegations are admissible circumstantial evidence of retaliatory intent, and all could, and would, be proved up by each individual Plaintiff.

In the analogous criminal context, the Ninth Circuit has held that the cross-admissibility of evidence is a significant factor in the joinder analysis. *See*, *e.g.*, *Comer v. Schriro*, 463 F.3d 934, 958 (9th Cir. 2006) (joinder of separate counts was not prejudicial because evidence was cross-admissible, and collecting cases). So too here: because the same evidence would be admissible in joint or separate trials, a joint trial will not prejudice Defendants.

## V.
## **CONCLUSION**

Severance in this case would be contrary to the provisions of Rule 20; would be contrary to the holdings and analyses of controlling case law; would not prejudice Defendants; and would waste judicial time and resources. For the foregoing reasons, the claims of all Plaintiffs should proceed together.

//

| | | |
|---|---|---|
| 1 | DATED:  February 6, 2015 | Respectfully submitted, |
| 2 | | BROWN WHITE & NEWHOUSE LLP |
| 3 | | s/*Caleb E. Mason* |
| 4 | | THOMAS M. BROWN |
| | | KENNETH P. WHITE |
| 5 | | CALEB E. MASON |
| 6 | | Attorneys for Plaintiffs |
| | | Downey Firemen's Association, |
| 7 | | Local 3473, et al. |

# CERTIFICATE OF SERVICE

The undersigned declares as follows:

    I am a citizen of the United States and employed in Los Angeles County, State of California. I am over the age of 18 and not a party to the within action. My business address is Brown White & Newhouse LLP, 333 S. Hope St., 40th Floor, Los Angeles, California 90071.

    On February 6, 2015, I electronically filed **Plaintiffs' Briefing on Joinder by Order of the Court** with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all attorneys of record in this action.

Executed on February 6, 2015 at Los Angeles, California.

                                             s/*Caleb Mason*
                                             Caleb Mason